FILED & JUDGMENT ENTERED
Steven T. Salata

May 11 2011

Clerk, U.S. Bankruptcy Court
Western District of North Carolina



_____
George R. Hodges
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| IN RE:<br><br>**RICHARD ALAN MAYS,**<br><br>Debtor. | Case No. 08-30950<br><br>Chapter 7 |
|---|---|
| **BANK OF GRANITE,**<br><br>Plaintiff,<br><br>v.<br><br>**RICHARD ALAN MAYS,**<br><br>Defendant. | Adv. Proc. 08-3087 |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter came on for trial before the Honorable George R. Hodges, United States Bankruptcy Judge for the Western District of North Carolina, on January 14, 2011. The attorneys for the parties presented their summation arguments to the court on January 25, 2011. Based on the evidence presented at trial and the arguments of counsel, the court makes the

following findings of fact and conclusions of law:

**FINDINGS OF FACT**

1.      Richard Mays (hereinafter "Mays") first met Marcelo Pinto (hereinafter "Pinto") in May 2006 when they both worked at Keffer Dodge.  Pinto was employed as the credit manager at Keffer Dodge, and in that capacity, he helped Mays put a hold on his credit.  In the course of helping Mays with his credit report, Pinto learned that Mays had a good credit score.  It was likely at this time that Pinto marked Mays as a participant in – and victim of – an elaborate fraudulent scheme.  Pinto and Mays both subsequently left the employ of Keffer Dodge.

2.      Around August 2006, Mays contacted Pinto in the hopes of getting a job with Pinto's new employer, Fort Mill Ford.  Mays subsequently interviewed at Fort Mill Ford.  After the interview, Mays and Pinto discussed opening a delicatessen with one of Pinto's associates, Giovanni Gambino (hereinafter "Gambino").

3.      Later that evening, Mays, Pinto, Gambino, and Marc Taylor (hereinafter "Taylor") gathered at Pinto's house to discuss opening a delicatessen.  During this initial meeting, Mays gave his credit card to Gambino so he could pay the fee to incorporate the delicatessen in Nevada.

4.      Sometime thereafter, Gambino, Pinto, and Mays approached Wachovia Bank about obtaining a loan for the delicatessen.  Mays submitted a financial statement and other documents setting forth his financial condition, but the loan request was ultimately rejected.  Mays testified that they also went to Bank of America to discuss a loan primarily for the purpose of determining what documentation they would need to provide a bank in order to obtain a loan.

5.      An associate of Gambino then suggested they request a loan from Bank of Granite (the "Bank").  Accordingly, Mays and Gambino went to a Bank of Granite branch and spoke

with a loan officer, Lee Williams (hereinafter "Williams"), about a loan for the delicatessen. Williams explained to Mays and Gambino that before Bank of Granite would consider making a loan to the delicatessen, the Bank would need to review documents relative to the delicatessen's corporate structure and pertinent to the financial condition of any individual who would own a stake in the borrowing entity such as two prior year's tax returns, financial statements, and W-2 forms.

6. As a result of their meeting with Williams at Bank of Granite, Mays, Gambino, Pinto, and Taylor subsequently met at Pinto's house and created the following documents:

a. false joint tax returns for Mays and his wife for the years 2004 and 2005 which misrepresented, among other things, that Mays received income of $415,329 in 2004, $436,985 in 2005, and $309,519.06 through September 15, 2006;

b. false pay stubs which misrepresented that Mays was employed with "Carolina International Partners, LLC" making $8,365.38 in gross salary per week;

c. false W-2 forms which misrepresented that Mays received wages, tips, and other compensation from Carolina International Partners totaling $391,499.78 in 2004 and $434,999.76 in 2005;

d. a pro forma for the delicatessen which included the following: (i) imagined projected sales and profits; (ii) a Business Plan which misrepresented that the loan was needed to pay the "remaining balance of the equipment cost" when no down payment was ever made for equipment and no equipment was ever purchased; and (iii) a page titled "Experience," which misrepresented that Mays had fourteen years of restaurant experience and was "East Coast Vice President of Logistics for C.I.P." and that his business partner, "Marcelino Patriciano," also had fourteen years of restaurant experience

and was head chef at Olive Garden for twelve years;

e.  a financial statement which misrepresented that Mays had total assets of $960,378, total liabilities of $432,947, and a net worth of $536,431; and

f.  a false invoice from "ARPA Restaurant Supply Company" which misrepresented that the delicatessen had already deposited $64,934.00 with ARPA for restaurant equipment and that the balance owed ARPA totaled $259,736.00.

7.  In truth, however, Mays never worked as a Vice President of Carolina International Partners.  In fact, Carolina International Partners is a fictitious company which never existed.  Despite his representations to the contrary, Mays was actually unemployed at the time the false documents were created.  When he was employed, Mays' salary never approached the level of the salaries set forth in the false tax returns, financial statements, W-2s, and pay stubs.  For example, in 2005 Mays and his wife earned income in the amount of $45,540.  In 2006, Mays' income totaled only $15,227.28.  Mays had no restaurant experience, and his financial statements grossly overstated his net worth.  Finally, no deposit was ever paid to ARPA Restaurant Supply Company, which was also a fictitious company.  Knowing that the information contained in the tax returns, W-2s, and wage statements was false, Mays nonetheless signed the false documents and witnessed Pinto forging Mays wife's name thereto.

8.  Mays and Gambino returned to Bank of Granite with the above referenced false documents and submitted them to Williams for the purpose of inducing Bank of Granite to make a loan to the delicatessen.  During this meeting, Williams, Gambino, and Mays discussed the prospective loan, Mays' employment, and various other matters relative to the delicatessen. Mays and Gambino explained that Mays would own the delicatessen while Gambino would manage it.  In addition, Mays misrepresented to Williams that, as Vice President of Carolina

International Partners, he was in the business of importing and exporting large equipment. Mays and Gambino also told Williams that they had already placed a deposit with ARPA Restaurant Supply Company for the purchase of restaurant equipment and needed the loan to pay the balance owed ARPA. Mays also submitted another financial statement to Bank of Granite, which grossly overstated his net worth. Finally, Mays misrepresented to Williams that he had already personally invested over $120,000.00 in the delicatessen, which would later be incorporated as "Gambino New York Deli & Specialty Foods, Inc." (hereinafter "Gambino NY Deli").

9. The creation and submission of the false documents coupled with the many written and verbal material misrepresentations made to Williams were clearly part of a fraudulent scheme by Mays, Pinto, Gambino, and Taylor to defraud Bank of Granite. What Mays likely did not know at the time, however, was that Pinto, Gambino, and Taylor also intended to double-cross Mays.

10. As part of his due diligence in making a loan on behalf of Bank of Granite, Williams reviewed all of the documents which were submitted to him; pulled and reviewed Mays' credit report; reviewed the Union County tax records to substantiate Mays' claim that he owned real property; called for a third party opinion about Gambino; spoke with an agent of Weingarten Realty, which leased retail space for the delicatessen; visited the site of the proposed delicatessen; and questioned Mays about his lack of cash flow compared to his stated net worth -- to which Mays responded by misrepresenting that he spent his extra cash making the deposit to ARPA for the restaurant equipment. Furthermore, Williams conditioned the making of the loan upon Gambino NY Deli securing it with collateral (the alleged equipment to be purchased from ARPA); required that the loan be guaranteed by Mays and the Small Business Administration;

obtained a lien waiver from Weingarten Realty; had another bank officer, Boyd Coggins, review the financial documents submitted by Mays and Gambino; and discussed the business operations of the delicatessen at length with Mays and Gambino.

11. Bank of Granite, unaware at the time that the information and documentation presented to it was fraudulent, eventually approved the loan request for $263,800.00 to Gambino NY Deli on the condition that Mays execute a Guaranty and that the Bank further receive a security interest in Gambino NY Deli's accounts, equipment, instruments and chattel paper, and general intangibles. The Small Business Administration (the "SBA") also approved the loan request upon these same conditions. On September 21, 2006, Williams sent Mays a commitment letter setting forth the requirements and conditions of the loan.

12. Meanwhile, on September 25, 2006, an Operating and Member Control Agreement of Gambino NY Deli was created which set forth that Mays was to be the sole Member of Gambino NY Deli. On September 26, 2006, Articles of Organization for Gambino NY Deli were filed with the North Carolina Secretary of State.

13. Mays signed the commitment letter and returned to Bank of Granite with Gambino on October 12, 2006, to execute the loan documents. Mays took the Operating and Member Control Agreement and Articles of Organization with him to the Bank. Finally, Mays executed the following documents in furtherance of the loan while at the Bank:

a. a Limited Liability Company Authorization Resolution which set forth Mays as the sole Member/ Manager of Gambino NY Deli;

b. a Universal Note and Security Agreement on behalf of Gambino NY Deli in the principal sum of $263,800.00 evidencing the loan Bank of Granite made to Gambino NY Deli and substantiating that Gambino NY Deli granted Bank of Granite a security interest

in its accounts, equipment, instruments and chattel paper, and general intangibles;

c.      Mays' personal Guaranty; and

d.      a Disbursement Authorization whereby Mays authorized $259,736.00 of the loan proceeds to be paid to ARPA Restaurant Supply Company.

14.      Bank of Granite subsequently filed a UCC financing statement, thereby perfecting its security interest in Gambino NY Deli's accounts, equipment, instruments and chattel paper, and general intangibles.

15.      In accordance with Gambino NY Deli and Mays' authorization and request, Bank of Granite prepared Official Check #285914051 in the sum of $259,736.00 made payable to ARPA (the "ARPA check") and handed the ARPA check to Mays. Mays then gave the ARPA check to either Gambino or Pinto.

16.      Unbeknownst to Bank of Granite, Pinto deposited the ARPA check into an account (the "ARPA account") with Wachovia Bank. Pinto originally opened the ARPA account on or about May 29, 1998, in the name of "Marcelo P. Pinto dba ARPA Restaurant Supply Co." Prior to the deposit of the ARPA check, the ARPA account had a zero balance.

17.      Thereafter, from October 2006 through December 2006, Pinto withdrew all of the money in the ARPA account. Pinto drew checks to, or otherwise wired money to, himself, Gambino, Gambino's wife, Crystal Gambino, Gambino's mother-in-law, Leah Beth Mason, Taylor, Mays, Gambino Enterprises, LLC, and other parties. None of the funds were used to purchase any restaurant equipment for Gambino NY Deli.

18.      A check in the amount of $6,000.00 was drawn from ARPA's Wachovia account to the order of Mays. Mays testified that he never knew about or ever saw the $6,000.00 check. Mays did, however, testify that he received approximately $5,000.00 from Pinto as

reimbursement for advances he personally made on behalf of Gambino NY Deli.

19. Gambino NY Deli never opened for business, although Mays made efforts to open the restaurant even after he was double-crossed by Pinto and Gambino. Mays also attempted to make the payments due under the Note, but ultimately Gambino NY Deli defaulted under the provisions of the Note and Mays defaulted under his Guaranty.

20. Mays testified that he always intended for the delicatessen to open. In support of this contention, Mays submitted into evidence various documents showing the efforts he made to open the delicatessen and make payments to Bank of Granite even after he learned that Pinto and Gambino double-crossed him. A friend of Mays', Patricia Porcelli, also testified that she tried to help Mays open the delicatessen after the fraud was discovered. Mays eventually retained a lawyer, William Terpening, who in turn notified the Federal Bureau of Investigations of the fraud. Despite the fact that Mays -- and presumably also Gambino and Pinto -- received target letters from the United States Attorney's Office, no indictments have been issued for this fraud.

21. Mays testified that he felt compelled to go along with Gambino, Pinto, and Taylor's plan to defraud Bank of Granite. In short, Mays' wife had recently left him, allegedly for financial reasons. At the time, Mays suffered from depression as a result of the break-up of his family and felt that if the delicatessen was a success, his family might be reunited. Mays suggested that Gambino, Pinto, and Taylor took advantage of his weakened state and that his actions were the result of his depression. Autumn Austin, Mays' counselor, testified that Mays did in fact suffer from major depression at the time and that he was "vulnerable and susceptible to suggestion by others."

22. Mays further testified that he did not personally profit from the fraud, alleging that the ill-gotten gains from defrauding Bank of Granite were divided among Pinto, Gambino,

8

and others; although he did admit receiving some funds from Pinto as "reimbursement."

23. Mays filed a Chapter 7 case with this court on May 12, 2008. Thereafter, on July 31, 2008, Bank of Granite filed this adversary proceeding against Mays seeking to have his debt to the Bank found to be nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and/or 523(a)(2)(B). In addition, the Bank asserted liability against Mays under state law theories of breach of contract, fraud, and unfair trade practices pursuant to N.C. Gen. Stat. §§ 75-1.1 and 75-16.1.

24. Mays contends that Bank of Granite did not justifiably rely upon the fraudulent misrepresentations with respect to statements other than those respecting his or Gambino NY Deli's financial condition. Mays also contends that Bank of Granite did not reasonably rely upon the fraudulent misrepresentations respecting his and Gambino NY Deli's financial condition. In support of these contentions, Mays points to, among other things: (a) various misspellings in the pro forma; (b) the fact that the false tax returns were misdated; (c) the fact that Bank of Granite could have obtained Mays' actual tax returns from the Internal Revenue Service for little cost; (d) discrepancies in the false documents between Gambino NY Deli and Gambino Enterprises, LLC; and (e) the Bank's failure to attempt to contact the nonexistent entities, Carolina International Partners, LLC and ARPA Restaurant Supply Company.

**CONCLUSIONS OF LAW**

1. This court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b) and § 157(a). This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Venue is proper pursuant to 28 U.S.C. § 1409(a).

2. By Order entered April 7, 2009, the court granted summary judgment to the Bank on its breach of contract claim. With respect to its claim for relief under 11 U.S.C. §

523(a)(2)(A), the court denied the Bank's motion for summary judgment but found that the Bank had established all elements of its first claim for relief except "justifiable reliance." Similarly, the court denied the Bank's motion for summary judgment on its claim under § 523(a)(2)(B) but found that the Bank had established all elements of its second claim for relief except "reasonable reliance." In addition, the court concluded that Mays provided false information to the Bank with the intent to obtain a loan for the deli. However, the court found that there was a factual dispute regarding whether the defendant realized from the outset that there would be no equipment and no deli and, therefore, that the issue of the defendant's intent relative to the overall scheme to defraud the Bank had to be determined at trial. Finally, the court denied the Bank's motion for summary judgment with respect to the state law claim of unfair trade practices because it was generally dependent on the resolution of the other remaining claims.

3. Having narrowed the issues before it on summary judgment, the court must determine whether the Bank established its state law fraud claim and that it justifiably relied on the defendants misrepresentations under § 523(a)(2)(A) or that it reasonably relied on materially false written statements regarding the debtor's financial condition under § 523(a)(2)(B). In addition, the court must determine whether the defendant had the requisite intent relative to the overall scheme to defraud the Bank and whether the Bank established a violation of N.C.G.S. §§ 75-1.1 and 75-16.1.

4. As the court outlined in its April 7, 2009, Order, to establish its state law claims sounding in fraud, the Bank must prove the following five elements of fraud by a preponderance of the evidence:

    (1)    false representation or concealment of a material fact,
    (2)    reasonably calculated to deceive,
    (3)    made with intent to deceive,
    (4)    which does in fact deceive,

  (5) resulting in damage to the injured party.

See Terry v. Terry, 302 N.C. 77, 83, 273 S.E.2d 674, 677 (N.C. 1981) (citing Ragsdale v. Kennedy, 286 N.C. 130, 209 S.E.2d 494 (N.C. 1974)).  Applying those 5 elements to this case, it is clear that Mays made false representations to Bank of Granite by knowingly participating in the creation and submission of fraudulent documents, which he and Gambino presented to the Bank for the purpose of inducing it to make a loan to Gambino NY Deli.  In addition, Mays made significant material misrepresentations to Williams with regard to his financial condition and matters not concerning his financial condition, including his employment status and restaurant experience.

  5. Mays' knowledge and intent is made clear by the fact that, having failed to obtain a loan from Wachovia using truthful financial statements, he thereafter participated in preparing and submitting multiple different fraudulent documents to Bank of Granite.  The only purpose for such documents was to create the impression that Mays was employed, wealthy, had restaurant experience, and had already placed a deposit on the restaurant equipment.  Mays' fraudulent intent to obtain the loan from Bank of Granite is well established by these facts.  And, as a result of Mays' false representations, Bank of Granite did in fact make the loan to Gambino NY Deli and was damaged as a result.  Therefore, the court concludes that the Bank has met its burden of proving that Mays committed actual fraud in this case.

  6. Next, the court will determine whether the Bank justifiably relied on the fraudulent misrepresentations of Mays in making the loan to Gambino NY Deli.  To successfully have the defendant's liability deemed non-dischargeable in his bankruptcy case under 11 U.S.C. § 523(a)(2)(A), the bank must establish that the debt was incurred through the following:

  (1) a fraudulent misrepresentation;
  (2) which induced the bank to act or refrain from acting;

  (3) which caused harm to the bank; and

  (4) upon which the bank justifiably relied.

See Foley & Lardner v. Biondo (In re Biondo), 180 F.3d 126, 134 (4th Cir. 1999).  The court found that Bank of Granite presented evidence on summary judgment establishing the first three elements of § 523(a)(2)(A).  Thus, the only issue left for the court's determination is whether the Bank justifiably relied on Mays' fraudulent misrepresentations.

  7. To satisfy the justifiable reliance requirement, Bank of Granite must show that it actually relied on Mays' misrepresentations.  See Colombo Bank v. Sharp (In re Sharp), 340 Fed.Appx. 899, 907 (4th Cir. 2009) (citing Field v. Mans, 516 U.S. 59, 68, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)).  Justifiable reliance is a minimal, subjective standard that encompasses "a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." See Field, 516 U.S. at 71, 116 S.Ct. 437 (citing Restatement of Torts (Second) § 545A, cmt. B (1976)).  Finally, justifiable reliance does not typically create a duty to investigate unless the circumstances give rise to red flags which prompt the need for further investigation.  See In re Sharp, 340 Fed.Appx. at 906-07 (citing Field, 516 U.S. at 71-72, 116 S.Ct. 437).

  8. Taking into consideration the testimony of Williams and his supervisor, Boyd Coggins, it is clear that the Bank actually relied on Mays' misrepresentations in making the loan to Gambino NY Deli.  Specifically, Williams testified that, among other things, he reviewed all of the documents submitted to him by Mays and Gambino and made additional inquiry with Mays about particular documents; pulled and reviewed Mays' credit report and certain tax records; contacted third parties to verify information; and visited the site of the proposed deli. And despite Mays' contention to the contrary, there were not a lot of red flags that should have caused Bank of Granite to discover Mays' fraudulent scheme -- in large part due to the elaborate

and convincing deceit on the part of Mays. The court is satisfied that Williams actually relied on the many, fraudulent misrepresentations of Mays; conducted the necessary investigation to confirm the truthfulness of the documents presented to him; but, nevertheless, could not have been expected to discover every misrepresentation made to him by Mays and Gambino. Accordingly, the court finds that the Bank justifiably relied on the fraudulent misrepresentation of Mays in making the loan to Gambino NY Deli.

9. For the court to find that the debt is non-dischargeable under § 523(a)(2)(B), the Bank must show that the debt was obtained by use of a statement in writing that:

(1) is materially false;
(2) respecting the debtor's or an insider's financial condition;
(3) on which the creditor reasonably relied; and
(4) that the debtor caused to be made or published with intent to deceive.

See 11 U.S.C. § 523(a)(2)(B). As with § 523(a)(2)(A), the court found that the Bank had presented evidence on summary judgment establishing all elements of § 523(a)(2)(B) except "reasonable reliance." Therefore, the court must determine if the Bank reasonably relied on the fraudulent financial documents tendered to it by Mays in making the loan to Gambino NY Deli.

10. The reasonable reliance standard of § 523(a)(2)(B) is a more demanding standard than the justifiable reliance standard of § 523(a)(2)(A). See Field, 516 U.S. at 61, 116 S.Ct. 437. Similar to justifiable reliance, reasonable reliance requires actual reliance. See id. at 68, 116 S.Ct. 437. In addition, however, the court must objectively assess the facts and circumstances to determine whether the Bank exercised "that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances." See In re Sharp, 340 Fed.Appx. at 908 (citing Ins. Co. of N. Am. v. Cohn (In re Cohn), 54 F.3d 1108, 1117 (3d Cir. 1995)).

11. Mays offered the testimony of a branch manager of another local bank who had

declined to make a loan to Gambino in order to suggest that Bank of Granite was neglectful in making the loan at issue here. The court finds that this testimony is not probative for several reasons. First, the circumstances are wholly different. Second, any opinion about the process Bank of Granite used in deciding whether to make this loan are based in part on hind sight. Third, Bank of Granite made a loan to Gambino NY Deli with Mays as a guarantor – not to Gambino individually. Finally, the court finds most compelling the fact that the SBA approved a loan request by Gambino NY Deli under conditions similar to the loan made by Bank of Granite. Thus, the court concludes that the Bank exercised the same degree of care as a reasonably cautious person in the same transaction and under nearly identical circumstances and, therefore, finds reasonable reliance under § 523 (a)(2)(B).

12.    In retrospect, Mays could always point to additional steps Bank of Granite could have taken in order to discover the very fraud he was committing upon it. However, in this instance, Bank of Granite exercised due diligence in making this loan and both justifiably and reasonably relied upon Mays' misrepresentations. Its efforts and actions were reasonable and sufficient. Mays had several opportunities to distance himself from, and retreat from, the fraud; however, he made the conscious decision to remain part of it. Thus, the court finds that Bank of Granite reasonably relied on materially false financial statements provided to it by Mays and regarding Mays' financial condition in making the loan to Gambino NY Deli. Consequently, the debt owed to Bank of Granite by Mays should not be, and is not, discharged.

13.    The court recognizes that its April 7, 2009, Order provided that there was a factual dispute regarding whether the defendant realized from the outset that there would be no equipment and no deli and, therefore, that the issue of the defendant's intent relative to the overall scheme to defraud the Bank had to be determined at trial. However, having now heard

all of the evidence, the court is satisfied that the Bank has proved that Mays' had the requisite intent with respect to the overall scheme to defraud the Bank. Mays was no doubt a secondary victim of Gambino, and to his credit he made some payments to the Bank and attempted to open the restaurant. Nevertheless, he was a participant in obtaining a loan from the Bank by presenting forged and counterfeit documents that significantly overstated his financial condition. In addition, he made verbal material misrepresentations to Williams regarding, among other things, his employment situation, his personal investment of over $120,000.00 in the delicatessen, and a deposit having been placed with ARPA for the purchase of restaurant equipment. It was at this point that the Bank was harmed and had presented sufficient evidence to establish Mays' intent to participate in the overall scheme to defraud the Bank despite the fact that the co-conspirators had plans about which he may not have been made aware. Given his intimate involvement in the fraud on the Bank, the court concludes that it is not necessary to find that Mays was involved in Gambino and Pinto's larger plans with respect to the restaurant. As it relates to Bank of Granite, the fraud was complete and the damage was done once the ARPA check was disbursed. The fact that Mays always intended to open the delicatessen and made efforts to do so is irrelevant.

14.    In addition, the court is not persuaded by the suggestion that Mays was compelled to participate in the scheme to defraud Bank of Granite. Mays did not introduce any evidence demonstrating that his actions were legally coerced. In fact, Mays was a willing participant in this affair, committed volitional acts to defraud Bank of Granite, and was not under duress or coercion. While Mays' depression might explain his motivation to do what he did, it does not absolve him of his actions.

15.    It is also irrelevant that Mays contends he received no direct financial benefit as a

result of this fraud because there is no requirement that Mays directly receive funds generated from this fraud for the debt to be deemed nondischargeable. See Pleasants v. Kendrick (In re Pleasants), 219 F.3d 372, 375 (4th Cir. 2000) (holding that the language of 11 U.S.C. § 523(a)(2)(A) is broad enough to include a situation in which no portion of a creditor's claim was "literally transferred to the fraudulent debtor"). In any event, Bank of Granite introduced evidence demonstrating that a check in the amount of $6,000 was drawn from ARPA's Wachovia account to the order of Mays. Mays insisted that he never saw this check but admitted receiving $5,000 from Pinto. Taking into consideration this evidence, the court concludes that it is most likely that Mays received some direct financial benefit as a result of this fraud. Mays also received funds in the form of the ARPA check in the amount of $259,736, which he then voluntarily handed over to Gambino or Pinto.

      16.      Finally, N.C. Gen. Stat. § 75-1.1 provides that "unfair or deceptive acts or practices in or affecting commerce are declared unlawful." Bank of Granite must make the following showing to establish a violation of § 75-1.1: (1) an unfair or deceptive act or practice, or unfair method of competition; (2) in or affecting commerce; and (3) which proximately caused injury to the plaintiff. See Peterson v. Bozzano (In re Bozzano), 183 B.R. 735, 738 (Bankr. M.D.N.C. 1995). Having determined that Mays' conduct constituted fraud and involved false representations, the court easily concludes that his conduct falls within the definition of an "unfair or deceptive" act and is, therefore, a violation of N.C.G.S. § 75-1.1. Since Bank of Granite has established a right to recover damages under N.C. Gen. Stat. § 75-1.1, the trebling of those damages pursuant to N.C. Gen. Stat. § 75-16 is automatic and not discretionary. See id.

    It is therefore **ORDERED** that:

    1.      Bank of Granite is entitled to recover against Mays a money award as a result of

his personal guaranty, for common law fraud, and for unfair and deceptive trade practices;

2. Pursuant to N.C. Gen. Stat. § 75-16, the aforementioned money award shall be trebled, such that the money award shall be for the principal sum of $791,400.00, plus interest at the rate of $58.62 per diem from March 5, 2007, until paid;

3. Pursuant to N.C. Gen. Stat. §§ 6-21.2 and 75-16.1, Bank of Granite shall have and recover of Mays an additional award for its attorney's fees in the amount of $39,570.00; and

4. This debt is non-dischargeable pursuant to both 11 U.S.C. §§ 523(a)(2)(A) and (B).

**This Order has been signed electronically.**               **United States Bankruptcy Court**
**The Judge's signature and court's seal**
**appear at the top of the Order.**